Shad v New York City Health & Hosps. Corp. (2025 NY Slip Op 51295(U))

[*1]

Shad v New York City Health & Hosps. Corp.

2025 NY Slip Op 51295(U)

Decided on August 15, 2025

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 15, 2025
Supreme Court, Kings County

Jaffer Hussain Shad and RUBINA SHAD, Plaintiffs,

against
The New York City Health and Hospitals Corporation, CONEY ISLAND HOSPITAL and RAMESH BABU M.D., Defendants.

Index No. 532619/2022

Plaintiffs
Edward Seth Goodman, Esq. (esg@simonsonlegal.com)
Simonson Goodman Platzer PC
111 John St, Ste 1400
New York, NY 10038
212-233-5001
Defendants
Hilary Carlton Agins, Esq. (hagins@fkblaw.com)
Furman Kornfeld & Brennan LLP
88 Pine Street, 32nd Floor
New York, NY 10005
212-867-4100

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR § 2219 [[a], of the papers considered in the review:
NYSCEF #s: 26 — 27, 28 — 66, 67 — 69, 70 — 73, 74
Defendants New York City Health & Hospitals Corporation ("NYCHHC"), also sued herein as Coney Island Hospital, and Ramesh Babu, M.D. ("Dr. Babu") move for an Order, pursuant to CPLR § 3212, granting summary judgment on the basis that Defendants are immune from liability under the Federal Public Readiness and Emergency Preparedness Act ("PREP Act"), and/or granting summary judgment on the merits of Plaintiffs' claims, and dismissing Plaintiffs' claims of medical malpractice and loss of companionship (Seq. No. 1).
Plaintiffs oppose NYCHHC and Dr. Babu's motion.
Plaintiff Jaffer Hussain Shad ("the patient") commenced this action on November 8, 2022, asserting claims of medical malpractice against Dr. Babu and NYCHHC/Coney Island Hospital in connection to the development and deterioration of spinal cord compression at NYCHHC Coney Island Hospital. Co-plaintiff Rubina Shad, the patient's spouse, also asserted claims of loss of companionship/services.
Plaintiffs alleges that Defendants failed to properly and adequately monitor Plaintiff's post-operative neurological progress, failed to recognize the progression in his neurological symptoms for spinal compression, failed to perform physical and neurological examinations, failed to timely conduct radiological tests prior Plaintiff's discharge, and failed to recognize the severity of Plaintiff's decedent's overall medical condition and degree of impairment.
The patient, who was 64 years old at the time of the events in question, was first admitted to Coney Island Hospital on March 4, 2021. He was treated for COVID-19 and intubated with mechanical ventilation. The patient was eventually extubated on March 15, 2021. On March 16, 2021, a swallow study (MBSS) revealed oral pharyngeal dysphagia. The patient was discharged on March 21, 2021.
The patient returned to Coney Island Hospital on March 28, 2021 with severe respiratory distress, difficulty speaking, and moderate pharyngeal dysphagia. On April 14, 2021, the patient underwent a cervical CT and MRI. The radiology imaging revealed anterior osteophytes involving the cervical spine, at C2, C3, and C4 which were causing dysphagia, and revealed acute cord edema and severe pre-existing posterior compression at C3/C4. On April 16, 2021, a repeat CT revealed evidence of osteoarthritis with large anterior osteophytes and multiple levels of degenerative disc disease.
On April 30, 2021, the patient was scheduled for a C3/C4 posterior cervical laminectomy for decompression of "severe cervical stenosis" with neurosurgeon Dr. Babu. However, after a talk with patient and his son on May 3, 2021, an anterior approach was agreed upon, deferring to patient's desire to focus on the treatment of dysphagia. On May 6, 2021, Dr. Babu with the assistance of non-party P.A. Abigail Hall ("P.A. Hall") performed an uncomplicated anterior cervical discectomy and fusion (ACDF) for removal of an osteophyte. Following the procedure, the patient remained at the hospital for post-operative care, and received antibiotics, Ancef IV, and Decadron until May 14, 2021.
On May 25, 2021, the patient underwent a PEG procedure for nutrition purposes. Medical records documented complaints of numbness of his extremities. On May 27, 2021, P.A. Hall (under the supervision of neurology consult Dr. Babu) performed neuro examinations on the patient, which revealed negative Babinski and Hoffman signs (tests to assess neuro function), and SILT (sensation to light touch) was decreased in the right aspect of the right hand and forearm. Additionally, the medical records documented the patient's report that a pillow had been removed from his head which was then followed with "shooting pains" down his arms. The record also noted that the pain subsided quickly, but in 3-4 days the patient started to experience [*2]tingling and slight weakness in his extremities. He denied any significant pain in his neck or extremities.
On May 28, 2021, the patient was re-evaluated by Neurosurgery and deemed stable for discharge. X-ray imaging determined stable construct of hardware. The patient was instructed to continue physical therapy and follow up in clinic in a month. The patient was discharged later that day with a rolling walker, PEG tube, and referrals for Visiting Nurse Services and home physical therapy.
The patient was readmitted to Coney Island Hospital days later on June 2, 2021, with worsening neurological symptoms and quadriplegia. Medical records noted his "complete loss of motor strength of all 4 extremities." An MRI imaging study revealed disc herniation that required emergent surgery. Later that day, Dr. Babu, assisted by non-party physician's assistants Cunningham and Francois, performed an emergent cervical decompression of C2/C4 for cervical spondylosis. the patient's recovery was complicated by Pseudomonas, PEG, Foley, and tracheostomy for respiratory muscle weakness from the cord compression. On September 13, 2021, the patient was discharged to Kessler for Rehabilitation.
Upon oral argument in open court, Plaintiffs withdraw all claims except those arising from May 25, 2021 through May 28, 2021. Accordingly, summary judgment is granted to the movants without opposition as to any claims arising from the patient's treatment from March 4 — March 21, 2021, March 28 — May 24, 2021, and his subsequent admission from June 2 — September 13, 2021. This includes any claims against Dr. Babu regarding performance of the May 6, 2021 surgery.
Plaintiffs allege that Dr. Babu and the Coney Island Hospital physician's assistants failed to timely appreciate and diagnose the patient's spinal cord compression when he exhibited new onset symptoms from May 25, 2021 through his discharge on May 28, 2021, and failed to perform an MRI. Plaintiffs allege that this delay in diagnosis and surgical intervention was a substantial factor in causing the patient's permanent spinal cord injury and incomplete quadriplegia.
As an initial matter, the movants argue that the claims against them must be dismissed pursuant to the federal PREP Act (42 U.S.C. § 247d-6d et. seq.).
The PREP Act generally confers immunity "from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure," if the countermeasure was administered or used during a declaration of a public health emergency. As it applies to the COVID-19 pandemic, the federal government declared such emergency on February 4, 2020, and defined the covered countermeasures to include "any antiviral, drug, biologic, diagnostic, device, or vaccine used to treat, diagnose, cure, prevent, or mitigate COVID-19" (Kluska v Montefiore St. Luke's Cornwall, 227 AD3d 690, 692 [2d Dept 2024], quoting Solomon v St. Joseph Hosp., 62 F4th 54 [2d Cir 2023]).
Generally, the PREP Act has been applied less frequently in New York than the state's Emergency or Disaster Treatment Protection Act (New York Public Health Law §§ 3080-3082), which was repealed on April 6, 2021 and no longer in effect at the time of the treatment at issue. In a Connecticut case dealing with the immunity issue, it was emphasized that "[i]n determining whether PREP Act immunity applies in a given case, courts focus on the claims of the plaintiff, as pleaded in the complaint" (Mills v Hartford Healthcare Corporation, 347 Conn. 524 [2023]). The court must ask whether the plaintiff's claim asserts a theory of liability related to the [*3]administration or use of a drug, device, or vaccine. In support of the motion, the movants cite to trial court cases in New York and other states, not mandatory but persuasive on this Court, in which the PREP Act and EDTPA were found to bar claims related to COVID-19 treatment, particularly the administration of vaccines.
Notably, Kluska is one of the few appellate court decisions which discusses the PREP Act and COVID-19 treatment in detail. In that case, involving a patient who developed pressure ulcers while being treated for COVID-19, the Second Department upheld the lower court's decision to deny dismissal on the basis of the PREP Act. While it was not disputed by the parties in that action that a ventilator was a "covered countermeasure" to treat or mitigate COVID-19, the appellate court held that the defendants "failed to establish that there is no significant dispute as to whether the injured plaintiff's pressure ulcers arose from the use of a ventilator" (Kluska at 692 [emphasis added]). Although that plaintiff's bedbound state and intubation may have increased his risk of skin breakdown, the claims arose from malpractice and negligence in pressure ulcer prevention and wound care.
In support of their motion, the movants argue that the federal statute's "all claims for loss caused by, arising out of, relating to, or resulting from" language should be interpreted broadly. They attempt to distinguish the events of this case from Kluska because when the patient returned to Coney Island Hospital with a primary complaint of dysphagia (difficulty swallowing), that symptom was "at least in part secondary" to the prior use of the ventilator to treat COVID-19.
During his second admission, it became evident that the patient had complex cervical spine osteoarthritis and osteophytes, requiring surgery. The movants' neurosurgery expert acknowledges that "complex cervical disease" and anterior osteophytic spurs were the cause of the patient's dysphagia and necessitated his May 6, 2021 surgery and post-operative care However, the movants argue that when the patient was first readmitted to the hospital for respiratory distress and moderate pharyngeal dysphagia, these symptoms were "at least partly" caused by his prior intubation, and this led to his CT scans, MRI, and anterior-approach surgery. They argue that "even if there were other comorbid conditions that contributed to the dysphagia," there was a causal link between his COVID-19 intubation, his subsequent evaluation and treatment by the neurosurgery team, and the claims herein. In their reply affirmation, they argue in stronger terms that the patient's injuries "did indeed arise from the intubation," unlike the pressure ulcers in Kluska.
In opposition, Plaintiffs dispute that the patient's injuries arose from or were caused by the use of a ventilator. Plaintiffs note that the patient's dysphagia was pharyngeal in nature, involving the throat and swallowing reflex rather than the mouth, tongue, and lips. They distinguish these symptoms from any oral dysphagia he may have experienced from the intubation during his first admission. They further argue that the CT scans and neurology evaluations he underwent during the second admission were wholly unrelated to any treatment, diagnosis, prevention, or mitigation of COVID-19.
Plaintiffs submit an expert affirmation from an orthopedic and spinal surgeon, which further supports their position that the osteophyte affecting the patient's pharynx, which caused his dysphagia and led to the May 6, 2021 surgery, was unrelated to COVID-19 or his March 2021 intubation. Plaintiff's expert opines that this osteophyte was a preexisting bony growth on his neck vertebrae, resulting from degenerative changes in his spine. Thus, there was no causal connection between any injuries or treatment and a "covered countermeasure" for COVID-19. [*4]His post-operative treatment, evaluations, and discharge were also unrelated to treatment or mitigation of COVID-19.
Based on these submissions, the Court finds the care and treatment at issue is not covered by PREP Act immunity. While the health care services provided by Coney Island Hospital initially involved the treatment and mitigation of COVID-19, including the use of a ventilator as a "countermeasure," Plaintiffs do not assert that the patient's injuries arose from, related to, or resulted from that countermeasure. Instead, the claims asserted by Plaintiffs arise from a delay in diagnosis and treatment for spinal cord compression from May 25, 2021 until his discharge on May 28, 2021, two months after his intubation.
Furthermore, all the injuries asserted in Plaintiffs' Complaint, including "spinal injury, spinal cord injury, quadriplegia, paralysis and severe pain and suffering," have no causal connection to the use of the ventilator of any covered countermeasure for COVID-19. While there is some dispute as to whether his dysphagia symptom was exacerbated by intubation, all parties agree that his pharynx was affected by a severe, preexisting spinal cord condition. Even considering the movants' argument that the COVID-19 intubation began a chain of events leading to the patient's neurology consults and spinal surgeries, the Court finds this connection is too remote and incidental to confer blanket immunity on all post-operative care he received. This care and treatment relates entirely to a spinal cord disorder that predated his COVID-19 treatment and caused his pharyngeal dysphagia, as well as numbness, pain, and other symptoms which were never linked to mechanical ventilation.
As in Kluska, Defendants have not made a showing as a matter of law that Plaintiff's claimed injuries arose or resulted from the use of a ventilator. Although the patient was treated for COVID-19 during his first admission in March 2021, the underlying claims involve an alleged failure to timely diagnose and treat spinal cord compression during his second admission, unrelated to the administration or use of any COVID-19 countermeasure. The part of the motion seeking to dismiss Plaintiffs' claims on the basis of the PREP Act is therefore denied.
Turning to the substance of the summary judgment motion, the Court applies the burden shifting process as summarized by the Second Department: "[A] defendant must make a prima facie showing either that there was no departure from good and accepted medical practice, or that the plaintiff was not injured by any such departure. Once a defendant physician has made such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the prima facie burden. Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." (Rosenzweig v Hadpawat, 229 AD3d 650, 652 [2d Dept 2024] [internal quotation marks and citations omitted].) However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v. Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023]).
In support of the motion for summary judgment, NYCHHC and Dr. Babu submit an expert affirmation from Kyle Chapple, M.D. ("Dr. Chapple"), a licensed physician board certified in neurosurgery who sets forth his experience with assessment and treatment spinal cord conditions.
Dr. Chapple opines that there were no departures in the standard of care by NYCHHC Coney Island Hospital with the treatment of the patient, and that discharge on May 28, 2021 was appropriate. Dr. Chapple's opines that the patient did not present with any additional symptoms [*5]that warranted any further investigation prior to discharge. Instead, Dr. Chapple opines that the patient's weakness and worsened nerve functions were "not unexpected" following a spinal surgery. He specifically opines that the patient's symptoms following an anterior laminectomy were expected, "especially given his constant coughing and resultant irritation to his diseased cervical spine." Additionally, he opines that the patient retained decent grip strength, and therefore physical therapy was the appropriate course of action and complied with the standard of care.
Dr. Chapple opines that the patient did not exhibit significant, new onset symptoms between the May 6 procedure and his May 28 discharge. Dr. Chapple notes that an "extensive" physical examination was performed by P.A. Hall, under the supervision of Dr. Babu, on May 27. At that time, the patient's Babinski and Hoffman signs were negative, and no significant pain was reported. Dr. Chapple opines that the patient's reports of shooting pain when a pillow was removed "resolved quickly," and the providers appropriately performed an exam and determined this was a "transient sensory issue, rather than a major neurological event."
Further, Dr. Chapple states that an MRI is required only for alarming symptoms such as "progressive weakness loss of bowel or bladder function, severe, worsening neurological deficits, and signs of acute spinal cord compromise (e.g., myelopathy, quadriparesis)," which the patient did not exhibit. Dr. Chapple opines that the patient's motor strength and sensory function were not a cause for concern and were not "severe or alarming," Therefore, Dr. Chapple opines that the patient's post-operative course complied with the standard of care, an MRI was not warranted, and his discharge was appropriate.
On the issue of proximate causation, Dr. Chapple disagrees with Plaintiffs' claim that an MRI would have prevented the patient's injuries. He opines that the patient's large posterior disc herniation was likely not present at the time of the May 6, 2021 surgery, nor any time prior to discharge. Dr. Chapple opines that the neurological decline must have occurred after discharge by way of a fall or trauma, as the patient's MRI results from June 2, 2021 "looked much different than the April MRI," revealing severe cord compression and a posterior herniated disc. Dr. Chapple opines that this severe herniation was not consistent with the patient's symptoms at the time of his discharge. He further opines that the "pillow incident," in which the patient reported shooting pain after a pillow was removed, may have caused nerve irritation, but could not have caused severe misalignment, herniation, or neurological deficits.
Finally, Dr. Chapple opines that Dr. Babu's ability to treat the patient's extensive cervical disease was limited. He notes that a posterior laminectomy was recommended by Dr. Babu prior to May 6, 2021, which would have allowed more effective decompression, but it was the patient's decision to undergo an anterior laminectomy to address his osteophytes and dysphagia. Dr. Chapple opines that while this recommended posterior surgery "would not have prevented the disc herniation seen on June 2, 2021," the patient's neurological status "may not have deteriorated as significantly" if the patient had consented at that time.
Based on these submissions, the movants have established prima facie entitlement to summary judgment, supported by an expert's opinions that Dr. Babu and Coney Island Hospital complied with the standard of care in their post-operative evaluation and treatment of the patient, that he did not exhibit severe or unexpected symptoms requiring an MRI, and his discharge on May 28, 2021 was appropriate. The expert also establishes that the alleged departures from the standard of care were not a proximate cause of the patient's injuries, opining that the herniation in the patient's June 2, 2021 MRI is inconsistent with his symptoms and more likely developed in [*6]the days after his discharge. The burden therefore shifts to Plaintiffs to raise a triable issue of fact.
In opposition, Plaintiffs submit an expert affirmation from a physician licensed to practice medicine in the State of New York, [name of expert redacted], who is board certified in orthopedic surgeon and sets forth their experience diagnosing and treating patients with spinal cord compression, osteophytes, and disc herniations. The unredacted, signed expert affirmation was presented to the Court for in camera inspection.
Plaintiffs' expert opines that Dr. Babu and the neurosurgery team at Coney Island Hospital departed from the standard of care by failing to appreciate and further investigate the patient's new onset symptoms beginning on May 25, 2021. Plaintiffs' expert focuses on the failure to consider a differential for spinal cord compression and opines that Dr. Babu should have understood the risk the patient was at for a "major compressive event."
Plaintiffs' expert counters the opinion of Dr. Chapple that the patient's symptoms were expected and normal following spinal surgery, opining that there was a clear onset of new symptoms beginning on May 25 which contrasted with his prior neurological exams. The expert notes that the patient's post-operative evaluations were consistently stable, he showed strong motor functions, and he made significant progress in his physical therapy and ambulation through May 20, 2021. There was a gap in physical therapy due to his PEG placement. On May 25, he reported neck pain and bilateral numbness in his lower extremities to his speech pathologist, which the expert opines was "a clear indication of potential worsening of cord compression." On May 26, the physical therapist noted his reports on right hand numbness, bucking knees, and poor standing balance, and he was referred to a neurosurgical follow-up. On May 27, the neurosurgical physician's assistant under Dr. Babu recorded that the patient had experienced "shooting pain" in his arms when a pillow was removed, a decrease in right upper extremity strength, and paresthesia in his hands and feet. A physical examination showed decreased motor strength.
Plaintiff's expert opines that in light of these subjective complaints and objective physical exam findings, an urgent MRI was "mandatory" to determine whether there was "potentially catastrophic neurologic deterioration." The expert opines that a physical exam and x-ray alone were not sufficient to determine whether these new onset symptoms indicated a disc herniation or worsening cord compression.
Plaintiffs' expert notes that the patient's neck pain, bilateral numbness of lower and upper extremities and worsening standing balance during physical therapy, all signaled potential onset of significant and dangerous cord compression. Paired with the potentially traumatic incident of the pillow documented in a May 27, 2021 neuro-exam, Plaintiffs' expert exclaims that Dr. Babu and Coney Island Hospital clearly should have ordered an MRI prior to discharge, and failure to do was a deviation of the standard of care.
Plaintiffs' expert further opines that it was a departure from the standard of care to discharge the patient on May 28, 2021, despite repeated documentation of his bilateral hand and feet numbness, increased muscle weakness, and decreased sensation compared to his prior physical therapy assessments. The expert opines that the standard of care required an MRI to be performed prior to discharge in light of these symptoms, and the standard of care also required a physician's assistant to perform an additional neurologic and physical examination on May 28.
As to proximate causation, Plaintiffs' expert opines that an MRI study would have revealed a large central posterior disc, which would have prompted urgent decompressive [*7]surgery much earlier than June 2, 2021. Plaintiffs' expert counters the opinion of the movant's expert that the posterior disc herniation was the result of new trauma following his discharge, as there is no evidence in the record of a new fall or injury, and onset of paralysis "does not require any significant trauma" in a patient with severe cervical spine disease. Plaintiffs' expert opines that prior to the patient's discharge on May 28, 2021, the patient did not yet have irreversible cord damage. Thus, Plaintiffs' expert opines that the MRI and subsequent spinal decompression surgery could have prevented the patient's permanent injuries.
Through their submissions and expert opinions, Plaintiffs raise triable issues of fact as to whether Dr. Babu's assessment of symptoms, decision to not perform further diagnostic tests, and decision to discharge were appropriate. "When experts offer conflicting opinions, a credibility question is presented requiring a jury's resolution" (Stewart v. North Shore University Hospital at Syosset, 204 AD3d 858, 860 [2d Dept. 2022], citing Russell v Garafalo, 189 AD3d 1100, 1102 [2d Dept. 2020]). Here, there are conflicting expert opinions as to whether the patient presented with symptoms sufficient to warrant an MRI and further diagnostic testing. While the movants' expert opines that the patient demonstrated normal post-operative symptoms, Plaintiffs' expert opines that Dr. Babu failed to consider his new onset pain, numbness, and decreased strength after May 25. The movants' expert opines that Dr. Babu acted appropriately in his discharge of the patient, whereas Plaintiffs' expert opines Defendant failed to appreciate the new complaints of pain, numbness, and decreased motor strength.
On the issue of proximate causation, Plaintiffs offer a conflicting expert opinion that the patient's incomplete quadriplegia was the result of the alleged departures from the standard of care. The movants' expert opines that the patient's disc herniation was likely the result of trauma after his discharge. Conversely, Plaintiffs offer an expert opinion that an MRI prior to discharge would have revealed the large central posterior disc and led to emergent decompression surgery. Plaintiffs' expert opines that if the Defendants had taken the proper diagnostic steps at Coney Island Hospital, including imaging studies, the diagnosis of spinal cord compression would have been made in a timely manner and a decompression surgery could have been done before irreparable damage to the patient's spinal cord occurred.
Based on the detailed submissions of experts on both sides, the Court finds that although the movants met their prima facie burden on the issue of liability and proximate causation, there is a clear conflict between the parties' experts on whether Dr. Babu and Coney Island Hospital departed from the standard of care in failing to order an MRI prior to discharge, given the patient's presentation, symptoms, and recent medical history. Plaintiffs have also raised issues of fact as to whether these departures proximately caused the patient's injuries. These issues of fact between the parties' experts must be resolved by a jury, and therefore, Dr. Babu and NYCHHC's motion for summary judgment, as to the claims arising from May 25 through May 28, 2021 is denied.
Accordingly, it is hereby:
ORDERED that Defendants NYCHHC/Coney Island Hospital and Dr. Babu's motion for summary judgment (Seq. No. 1) is granted to the extent of dismissing any claims other than those arising from May 25 through May 28, 2021, and the motion is otherwise denied.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez
[*8]J.S.C.